UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


EQT GATHERING EQUITY, LLC,[1]
a Delaware limited liability company, and
EQT PRODUCTION COMPANY
a Pennsylvania corporation,

       Plaintiffs

v.                               Civil Action No. 2:09-0069

FOUNTAIN PLACE, LLC,

       Defendant.


MEMORANDUM OPINION AND ORDER


       Pending are (1) plaintiffs' EQT Gathering Equity, LLC's ("EGE") and EQT Production Company's ("EPC") (a) motion and renewed motion for a preliminary injunction, filed respectively on February 13 and March 19, 2009, and (b) motion for summary judgment on Counts I and II of the complaint, filed March 19, 2009; and (2) defendant Fountain Place, LLC's ("Fountain Place") motion for partial summary judgment as to Count I and motion for summary judgment as to Count II, filed March 19, 2009.  The court has also received the parties' supplemental briefing, with the last submission being filed May 27, 2009.

_____

       [1]Plaintiffs' counsel advises that the correct name for this entity is as it now appears in the caption.  The Clerk is directed to amend accordingly.

I.

A.   Relevant Documents and Language in the Chain of Title

Prior to 1944, Island Creek Coal Company ("Island Creek") was the owner in fee of the property in Logan County which is the subject of this dispute ("the subject property"). (Stip. ¶ 1).  In an "Agreement of Lease" dated April 13, 1944 ("CCC lease"), Island Creek leased to Columbian Carbon Company ("CCC") 30,380 acres of oil and gas rights on parcels that included the subject property.  (Id. ¶ 2; id., ex. B at 1 ("CCC Lease at ---")).

CCC was given broad rights to explore for, produce and transport oil and gas on the subject property, "together with adequate and appropriate rights of way and easements for such purpose."  (CCC Lease ¶¶ 2, 3).  The CCC Lease, however, also contained the following language, referred to throughout as "the proviso[:]"

> All pipe lines except those used to conduct gas and
> water for drilling engines shall be buried below plow
> depth in cultivated land and at a safe depth when
> crossing under railroads, highways and haulroads.

(CCC Lease ¶ 8).  Respecting the issue of successors, the CCC lease provides as follows:

2

> This lease and all the terms, provisions and
> covenants herein contained shall extend and inure to
> and be binding upon and for the benefit of the
> successors and assigns of the respective parties hereto
> . . . .

(CCC Lease ¶ 22).

On December 16, 1965, Island Creek sold to Georgia-Pacific Corporation ("Georgia-Pacific") its surface rights to most of the land it owned in Logan County, including the subject property ("Georgia-Pacific Deed"). (Stip. ¶ 3). The Georgia-Pacific Deed provided that the conveyance was subject to "[t]he right, title and interest of . . . [CCC] and its successor, Cities Service Company, under . . . [the CCC Lease] . . . and [a] January 16, 1955 [lease] . . . ." not found in the record. (Georgia-Pacific Deed ¶ 2). The Georgia-Pacific Deed further noted that the grantee received the conveyance subject to "[a]ll existing agreements providing for the use or occupancy of the land hereby conveyed . . . provided, however, that Island Creek hereby assigns to Georgia-Pacific all its rights under said agreements." (Georgia-Pacific Deed ¶¶ 2, 3).[2]

---

[2]The Georgia-Pacific deed contained another provision as well:

> Georgia-Pacific covenants and agrees that Island
> Creek, its successors and assigns, may at any and all
> times and without charge, and upon the conditions
>                                                  (continued...)

3

On November 12, 1968, Columbian Fuel Corporation
("CFC"), a successor in interest to CCC under the CCC Lease,
dissolved.  (Stip. ¶ 4).  The rights of CCC and CFC under the CCC
Lease were then transferred to Cities Service Oil & Gas
Corporation, and then to Ashland Exploration, Inc., then to
Blazer Energy Corporation, which is now known as EPC, a producer
and seller of natural gas.  (Id. ¶ 4).

On December 20, 1996, Georgia-Pacific conveyed several
parcels to Monterra Development Corporation ("Monterra
Development"), including the subject property.  (Id. ¶ 5).  The

---

[2](...continued)
specified, exercise the following rights and privileges
on, in and underlying the land hereby conveyed, viz:

1.    To maintain and operate and continue all
existing buildings, structures, machinery, improvements
and facilities, of whatever kind and nature,
appurtenant to the exercise of the rights and
privileges herein reserved to Island Creek and to the
mining or development of the coal, oil, gas, and other
minerals herein reserved to Island Creek or of coal,
oil, gas and other minerals mined or extracted from any
lands, and from time to time to relocate, rebuild, and
remove the same . . . .

(Georgia-Pacific Deed at 17).  The court does not understand this
provision to expand the rights of CCC, and hence plaintiffs,
under the CCC Lease or otherwise.  The language appears aimed
instead at reserving the most profound level of flexibility to
Island Creek as it continued to develop the mineral resources on
the subject property.  The Georgia-Pacific Deed's explicit
mention of the CCC lease, without further elaboration, supports
this reading.

4

conveyance was made subject to "[a]ll easements, rights of way .
. . and other . . . encumbrances of record" and "[p]rior . . .
conveyances of mineral rights or mineral leases of every kind and
character."  (Stip., ex. D at 2 and I).

On December 31, 1996, Monterra Development sold the
subject property to Monterra Marketplace, Inc. ("Monterra
Marketplace"), with the "conveyance . . . made subject to
existing . . . private rights and easements . . . ."  (Id. ¶ 5;
id., ex. E at 1).  On February 8, 2001, Monterra Marketplace
conveyed the subject property to Fountain Place.  (Stip. ¶ 6).
The conveyance was again made subject to "all exceptions,
reservations and conditions contained in . . . all prior
instruments of record pertaining to the real estate . . . ."
(Id., ex. F at 7-8).

B.   Circumstances Surrounding the Parties' Dispute

1. The Factual Record Developed as of April 22, 2009

The parties have stipulated that, in 1947, a gas well
was drilled pursuant to the CCC lease.  (Stip. ¶ 7).  The well,
Island Creek Coal D4, is now operated by EPC and falls within the

boundaries of the subject property.  (<u>Id.</u> ¶¶ 7-8).  The
significance of D4 is not explained but its relevance appears
limited to the fact that it is attached to a segment of EGE
gathering pipeline on the subject property, which plaintiffs
refer to, alternatively, as BR-886/1875[3].  That segment of
pipeline is at the center of this controversy. (<u>Id.</u> ¶ 9).

Prior to the supplemental briefing, counsel suggested
that there were two locations along BR-886/1875 at issue.  The
first is known as the "middle haulroad" or "middle path[,]" which
will be referenced throughout as "Location No. 1."  (<u>Id.</u> ¶ 10).
The second is known as the "lower haulroad" or "lower path" and
referred to as "Location No. 2."  (<u>Id.</u> ¶ 11).[4]  Portions of BR-

---

[3]Counts One and Two of the complaint, <u>inter</u> <u>alia</u>, refer to
the relevant pipeline section as BR-886.  In their more recent
supplemental briefing plaintiffs refer to that same pipeline
section as BR-1875.  Defendant responds that "there is no proof"
supporting plaintiffs' alteration of the pipeline section name.
Defendant thus continues to refer to the pipeline section as BR-
886.
    The court is unable to resolve the factual dispute
respecting the correct name of the pipeline section.  The
pipeline section is thus referred to as "BR-886/1875[,]" except
where it appears only as "BR-886" within direct quotations from
pleadings and other papers filed in the case.

[4]The "path" and "haulroad" distinction arises out of the
parties' inability to agree respecting whether an access way
commonly known as a "haulroad" exists, or ever existed, in the
area of Location Nos. 1 and 2.  (Add. to Stip. ¶ 1).  The
disagreement perhaps arises from the language of the proviso in
                                              (continued...)

6

886/1875 that transport natural gas are unburied, running above the surface of Location Nos. 1 and 2. (Id. ¶ 12). The parties concur that the CCC Lease applies to both Location Nos. 1 and 2. (Id. ¶ 13).

Fountain Place tendered the affidavit of Eddie Hurley, a Fountain Place member, stating as follows: (1) after Fountain Place purchased the subject property in 2001, he learned the "owners of the gas wells" were working on the subject property, (2) he does not know the nature of the work, (3) in the Summer of 2008, he inspected the subject property and found that a six-inch pipeline had been installed "over our haulroads[,]" and (4) during 2007 he observed plaintiffs replacing 2,059 feet of pipeline with six-inch pipeline from Route 73 to plaintiffs "gas metering system . . . ." (Def.'s Mot. Summ. J. as to Count II, Ex. B, Aff. Of Eddie Hurley at 1-2).

During 2008, the Logan County Commission applied to the West Virginia Public Service Commission Tower Access Fund for a

---

[4](...continued)
the CCC Lease. Plaintiffs contend the access way in the vicinity of Location No. 1 was (1) not a "haulroad" at the time BR-886/1875 was installed, or (2) at least that it was not "then being used as a 'haulroad[.]'" (Id. ¶¶ 1, 7). Fountain Place indicated originally that it was "without knowledge or information sufficient to form a belief" on the point. (Id. ¶ 8). As discussed within, further evidence has come to light on the point.

grant to fund the infrastructure for a cellular phone transmission tower ("cell tower").  (Id. ¶ 14).  The cell tower creates new mobile phone connectivity for 911 and other emergency services from Fountain Place Mall to Chief Logan State Park Convention Center, connectivity that Fountain Place contends is "urgently needed . . . ."  (Id.; Def.'s Mot. Summ. J. at 3).  The cell tower is to be constructed on the subject property and owned and operated by Paradigm Wireless Company ("Paradigm").

In the Fall of 2008, Fountain Place asked plaintiffs to bury BR-886/1875 at Location Nos. 1 and 2 to, inter alia, allow Paradigm to move vehicles and equipment to the proposed cell tower site.  (Id. ¶ 16).  It appears the burial or relocation at Location No. 1 is necessary inasmuch as vehicular access at that point is necessary for construction of the proposed cell tower. (Add. to Stip. ¶ 2).[5]

On December 2, 2008, Fountain Place contends that plaintiffs advised it to excavate in certain areas around BR-

_____

[5]At some time subsequent to April 22, 2009, Fountain Place constructed an alternate roadway to the cell tower site so that core drilling samples could be taken.  For this reason, Fountain Place contends that, while it still requires burial of the pipeline crossing Location No. 1 for planned construction activities, the "prior urgency has been abated."  (Def.'s Supp. Br. at 5).

886/1875.  (Id. ¶ 18).  It is uncertain where the excavation was
ordered, if at all, inasmuch as the parties dispute the nature of
the excavation instructions given by plaintiffs.[6]  (Add. to Stip.
¶ 4).

On December 5, 2008, EGE advised Fountain Place that
$45,000 was the estimated cost for a safe crossing over BR-1875.
(Id. ¶ 19).  Plaintiffs appear to suggest that the December 5,
2008, communication was prompted by Fountain Place excavating
beneath BR-886/1875.  Fountain Place contends, as noted, that the
excavation proceeded according to plaintiffs' excavation
instructions.  (Compl. ¶ 24).  It was Fountain Place's apparent

---

[6]The addendum to the stipulation provides pertinently as
follows:

Defendant contends that Plaintiffs advised
Defendant to excavate the hillside under the pipeline
to a depth below Location No. 1.

Plaintiffs contend that they advised Defendant to
excavate the hillside to a certain distance from the
BR[-886/1875] Pipeline at Location No. 1.

(Add. to Stip. ¶¶ 5-6; see also (Def.'s Mot. Summ. J., Ex. 6,
Aff. of C. David Morrison at 2 (stating that plaintiffs' employee
Wetzel Davis "asked if . . . [Fountain Place] could use . . .
[its] excavator to dig into the mountain under the [BR-886/1875]
pipeline so that the pipeline could be welded and a bend placed
in the pipe and installed in a vertical direction over the bank
to go below the road level; Mr. Davis asked when we could do the
excavation and I told him that we could get on it that afternoon
. . . .")).

intention to construct a passageway under BR-886/1875 that would allow vehicles and equipment to access the proposed cell tower site. (Compl. ¶ 24). Plaintiffs requested Fountain Place to cease and desist. (Id. ¶ 26). As a result of its excavation efforts, Fountain Place contends that there is currently a minimum of 12 feet clearance from the road to the bottom of BR-886/1875.

On December 23, 2008, Fountain Place advised plaintiffs that if BR-886/1875 was not buried at plaintiffs' expense at Location Nos. 1 and 2 by January 15, 2009, Fountain Place would seek an injunction commanding as much. (Id. ¶ 20). On January 8, 2009, plaintiffs responded anew with a $45,000 demand for the burial work. (Id. ¶ 21). On January 16, 2009, Fountain Place renewed its position that the proviso compelled plaintiffs to bury BR-886/1875 at a safe depth without cost to Fountain Place when that pipeline, or any other EPC or EGE line, crossed haulroads on the subject property. (Id. ¶ 22).

Chris Hendrick, the Assistant Pipeline Superintendent for EGE, contends that the haulroad or pathway at Location No. 1, which now passes well under BR-886/1875 due to Fountain Place's excavation, is not in good shape. He attests that the haulroad or pathway is "not very wide, consists of deep mud and has close

10

banks" and that it:

> is not very stable and is susceptible to slipping and
> other potential hazards resulting in loss of control by
> a driver resulting in contact with BR-886 . . . which
> would likely result in an explosion.

(Pls.' Resp. to Def.'s Memo. in Supp. of Summ. J. as to Count I,
Aff. of Chris Hendrick, Ex. E ¶ 9 ("Hendrick Affidavit")).
Fountain Place replies with a drawing from Heritage Technical
Associates, Inc., which it believes contradicts the rather grim
assessment from Hendrick.  (Def.'s Reply on Def.'s Memo. in Supp.
of Summ. J. as to Count I, Ex. 2).

Brian Miller, Superintendent of Pipelines for plain-
tiffs, also attests that (1) the proposed crossing constructed
under BR-886/1875 by Fountain Place, and (2) the original plan to
move the 9.25 foot drilling rig through it, "violates industry
practices and standards as well as . . . [plaintiffs'] policies."
(Pls.' Resp. to Def.'s Memo. in Supp. of Summ. J. as to Count I,
Aff. of Brian Miller, Ex. F ¶¶ 9, 11 ("Miller Affidavit")).
Miller further states that "taking . . . any . . . equipment
underneath . . . [BR-886/1875] is unsafe in that human or other
error could result which would, in turn, result in a rupture . .
. causing severe injury or death."  (Miller Aff. ¶ 12).

On January 26, 2009, plaintiffs instituted this action
with a six-Count complaint.  Count One seeks to enjoin Fountain

11

Place or its agents from any further surface activities "upon,
over, under or related to the BR[-886/1875] Pipeline . . . until
such time as a proper and safe crossing is constructed by
plaintiffs . . . ."  (Stip. ¶ 23; Compl. Prayer at [1](a)).
Count Two seeks a declaratory judgment "that . . . [Fountain
Place] be required to pay for the remedial measures to be
undertaken by Plaintiffs to bury and/or relocate . . . BR[-
886/1875] . . . ."  (Compl. Prayer ¶ [3](a)).  Plaintiffs assert
that a proper pipeline crossing or relocation of BR-886/1875 is
necessary in order for Fountain Place and Paradigm to continue
their construction activities and that, pursuant to Quintain
Development, LLC v. Columbia Natural Resources, Inc., 210 W. Va.
128, 556 S.E.2d 95 (2001), Fountain Place must pay all associated
expenses.

## 2. The Factual Record Developed After April 22, 2009

On April 22, 2009, counsel appeared for a status
conference with the court.  The court discussed with counsel the
need for discovery based upon certain evidentiary gaps.  In
particular, the parties noted the necessity of deposing Charles
Hopkins, an individual who had previously submitted an affidavit
on plaintiffs' behalf.  Immediately following the status

conference, the court convened a hearing.  At the conclusion of the hearing, the court set forth additional stipulations reached by the parties, including (1) a fuller explication of plaintiffs' predecessor entities as set forth in paragraph 4 of the Agreed Stipulation of Facts; (2) that the complete evidentiary record by which the parties wished the court to resolve the pending dispositive motions consisted of the documentary evidence submitted heretofore, supplemented by the Hopkins deposition, and any further discovery taken by agreement and concluded and disclosed to the court no later than May 16, 2009, and (3) that the pending summary judgment motions might encompass not only Counts I and II, but the remaining Counts as well, as to liability respecting the issues surrounding BR-886/1875.

On May 16 and 18, 2009, respectively, the parties concluded the evidentiary record by filing additional affidavits, depositions, and certain documentary evidence, all of which have been considered by the court.  The parties' supplemental briefs and responses, have been received as well, with their final submission filed May 27, 2009.  A summary of the additional evidence follows.

Plaintiffs' additional evidence consists primarily of testimony from two deponents, Hopkins and Randall Lee Bowen.

From at least 1978 to 1997, Hopkins, a 57 year-old well tender, was responsible for walking the pipelines present on the subject property. (Dep. of Charles M. Hopkins at 8, 10-11).  Hopkins has lived in the area around the subject property his entire life. (Id. at 46).  Bowen, also a well tender, walked the pipelines at least once annually from 1997 to 2008 and as many as four times in one particular year.  (Dep. of Randall Lee Bowen at 5-6, 7, 18).

Exhibit 6 to the Hopkins' deposition is an apparent satellite photograph of the subject property, with red, blue, and green markings affixed on it that, according to plaintiffs, indicate the gas pipelines and wells on the subject property. Locations No. 1 and No. 2 are inexplicably not reflected on Exhibit 6.  Handwritten numbers, from 1 through 8, were placed on Exhibit 6 by plaintiffs' counsel during the Hopkins deposition.[7] Over top of a red line representing one pipeline segment and running generally north to south are, in order, counsel's

---

[7]Hopkins candidly testified, contrary to his affidavit, that he is unable to identify the pipelines on the property by EQT's "BR" designations.  (Id. at 16).  Specifically, he stated that the BR-886 mentioned in his affidavit, which plaintiffs now contend is actually BR-1875, "means nothing to" him.  (Id. at 17).

**14**

handwritten numbers 3, 5, 8 and 7, with 3 the northernmost and 7 the southernmost.[8]

Hopkins testified that the pipeline segment represented by handwritten numbers 3 to 7 had always been located above the ground "as far as . . . [he could] remember[.]" (Id. at 53). Bowen testified similarly that a smaller portion of the same pipeline segment, between numbers 3 and 8, had never been buried during the 11 years he walked it. (Bowen Dep. at 8-9).[9] Hopkins further observed that a lesser portion of the pipeline segment, from handwritten numbers 8 to 7, had been relocated only once

_____

[8]Bowen testified not with reference to Exhibit 6 used during the Hopkins deposition but rather a separate Exhibit 1. Exhibit 1 to the Bowen deposition, however, is identical to Exhibit 6 to the Hopkins deposition except in one critical respect. Counsel did not write or use the same numerical points of reference on the two Exhibits. Nevertheless, a careful reading of the two depositions and comparison of the two Exhibits allows the two different numbering systems to be reconciled for consistency sake. The court, whenever possible, refers to the numbering system used on Exhibit 6 as a common means for setting forth the points identified by Hopkins and Bowen during their respective depositions.

[9]Later, Bowen appeared to suggest that, at certain points left unspecified, the pipeline segment between handwritten points 3 and 8 is buried when it crosses certain access roads. Later, however, he suggested that the buried portions of the pipeline to which he referred were not within the segment represented by points 3 and 8, but a bit further north of that segment, without elaboration. (Id. at 22). While he later equivocated a bit on the point, he never testified that the pipeline was buried within the segment represented by points 3 and 8.

15

since it was originally laid, on a date unknown to him.  (Hopkins
Dep. at 50-51).  Bowen testified that the referenced pipeline
section, from handwritten numbers 8 to 7, was moved during the
time that he walked the area.  (Bowen Dep. at 22).  Hopkins
testified that the remaining portion of the pipeline segment,
from handwritten numbers 3 to 8, had never been relocated.[10]
(Hopkins Dep. at 51).  Hopkins explained that his employer "never
buried any pipelines just for the simple fact that it made it a
lot easier to walk.  It made it a lot easier to repair."
(Hopkins Dep. at 30).  Bowen noted, however, that he never drove
across an exposed pipeline and that "anytime they were exposed I
tried to get them covered."  (Bowen Dep. at 16).

        With respect to hauling activities in the area, Hopkins
testified that he cannot remember any such work on the property
during his lifetime.  (Hopkins Dep. at 46).  He noted in
particular the absence of "coal trucks" and "logging" on the
subject property.  (Id. at 47).  He added that he remembered no
"active hauling" in the area of the pipeline represented by the

_____

        [10]Plaintiffs contend that the pipeline segment represented
by the line between handwritten numbers 3 and 8 is of importance
because it represents "the area of Location Nos. 1 and 2 . . . ."
(Pls.' Supp. Submiss. of Evid. at 3) (stating also that "The only
portion of the pipeline at issue in this stage of the litigation
is depicted . . . between points No. 3 to approximately No. 8.").

16

aforementioned red line segment listed on Exhibit 6 to his deposition running between handwritten numbers 3 and 8.  (Id. at 52).  He admitted though that it was "very possible" that Georgia-Pacific could have done some logging, about which he would not have known, but stated further that while working he "was in the area every[]day . . . ."  (Id. at 61).  Bowen testified, respecting the pipeline segment between numbers 3 and 8, that (1) no one hauled coal, timber, or anything else commercially from the area, and (2) the only roads crossing the pipeline segments were "access roads" that one could drive a vehicle on but that were, "[f]or the most part[,]" overgrown. (Bowen Dep. at 8-9, 12).

Hopkins also stated that any roads in the area between handwritten numbers 3 and 8 were "lease roads[,]" which he characterized as "just enough to get a four wheel drive from one well to the other" and "more likely put in by the gas company to get to the well to drill it."  (Hopkins Dep. at 53, 67).  He testified that his employer used the roads to haul sections of pipe in to replace leaks in the line, but did so by pulling the replacement piece in with a bulldozer, which cleared the way along the road as the pipe was hauled in.  (Id. at 57).  This is consistent with Mr. Hopkins' earlier affidavit, wherein he stated

17

that the pipeline, to which he referred to exclusively as BR-886,
"did not cross over any area being used as a haulroad."  (Pls.'
Mot. Summ. J., Ex. B, Aff. of Charles M. Hopkins ¶ 7).  Bowen
agreed that if replacement pipe had to be taken into the area, a
"dozer . . . [would] go over whatever access road there was
clearing the way and drag the pipe in . . . .  (Bowen Dep. at
10).

       The additional evidence offered by Fountain Place
consists of a supplemental affidavit from Hurley and an affidavit
from Hiram Preece, a heavy equipment operator employed by
Fountain Place in 2001.  Preece states as follows:

> [S]hortly after I went to work for Fountain Place . . .
> a forest fire broke out above the mall; I drove a
> bulldozer to the fire to build fire breaks; that due to
> the fire I was caused to abandon the bulldozer I was
> driving right at the point on the upper road where the
> 8 inch pipeline went under the road and straight down
> the mountain; the 6 inch pipeline shown in Exhibit 6 to
> the . . . Hopkins deposition which runs around the
> mountain along the upper road was not there at that
> time; that after the fire was put out the gas line
> company replaced the 8 inch pipeline with a 6 inch
> pipeline and ran the existing 6 inch pipeline along the
> upper road for approximately 400 feet before placing
> the pipeline at a right angle under the upper road and
> dropping the gas line called BR-886 over the hill
> toward the gas well located near the social security
> building, which I am told is referred to as Gas Well D-
> 4; that I have inspected Exhibit 6 to the . . . Hopkins
> deposition and it may have reflected where the gas
> pipelines were installed in 1993 but said Exhibit 6, to
> the best of my knowledge and belief, does not reflect
> where the gas pipelines are presently installed from

> Gas Well D-4 to Gas Well D-11; Exhibit 6 shows the
> pipeline, which I am told is referred to as BR-886, as
> running parallel to the middle and lower roads whereas
> the pipeline currently installed runs perpendicular to
> the haulroads and crosses over the haulroads as it goes
> up the hill toward the upper road where it crosses
> under it . . . .

(Aff. of Hiram Preece at 1-2).[11]

        In his supplemental affidavit, Hurley agrees that
Exhibit 6 to the Hopkins deposition does "not accurately reflect
the pipeline BR-886 that's presently situated on Fountain Place .
. . property. . . ."  (Add. Hurley Aff. at 2).  He adds that "the
existing pipeline known as BR-886 is not 16 years old; [and] that
. . . [his] opinions are based upon . . . extensive knowledge of
Defendant's property and the age of gas pipelines . . . ." (Id.)
Hurley also contends that as a result of the 2001 fire, "gas
company employees . . . discovered problems with the pipeline and
began replacement of the pipeline after the fire . . . ."

(Id.)[12]

───────────────

[11]In a supplemental brief, Fountain Place contends that
"[p]laintiffs need to produce the documents related to the work
carried out after the 2001 fire."  (Def.'s Supp. Br. at 4).
Fountain Place does not suggest these "documents," assuming any
exist, would result in the development of material facts
supporting its contentions.  Additionally, Fountain Place agreed
to an abbreviated discovery period and has not moved in
accordance with Rule 56(f).

[12]Fountain Place also submitted a supplemental affidavit
from C. David Morrison, the former Chief Executive Officer of
Monterra Development.  Morrison contends that Georgia Pacific
retained the right until December 20, 2008, "to timber the mall
                                              (continued...)

19

II.

A.    Summary Judgment Standard


A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the

_____

[12](...continued)
site property and further retained the right to utilize all existing public and private roads and streets for such purpose . . . ."  (Supp. Morrison Aff. at 1-2).  Morrison does not indicate that the retained roads and streets were used by Georgia Pacific.

non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); <u>id.</u> at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  <u>Overstreet v. Ky. Cent. Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the

21

light most favorable to the party opposing the motion."  <u>United
States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).


B.   Analysis


        The Supreme Court of Appeals of West Virginia

confronted a factual setting similar to this one in <u>Quintain
Development, LLC v. Columbia Natural Resources, Inc.</u>, 210 W. Va.

128, 556 S.E.2d 95 (2001).  In <u>Quintain</u>, at issue was the

relocation of a 16-inch natural gas pipeline owned by Columbia

Natural Resources, Inc. ("CNR").  The pipeline crossed certain

parcels through easements obtained by CNR's predecessor in

interest.  The relevant language creating the easements provided,

in part, as follows:

> "It is expressly understood and agreed that the rights
> and privileges hereby granted shall not interfere with
> the proper and reasonable use of said premises for the
> mining and removal of coal and other minerals therefrom
> or the cutting and removing of timber from said
> premises." . . .
>
>     "The said grantors, their heirs or assigns, to
> fully use and enjoy the said premises, except for the
> purposes hereinbefore granted to the said United Fuel
> Gas Company, a corporation, which hereby agrees to pay
> any damages which may arise in the future from the
> maintaining, operating and removing of said pipe line .
> . . ."

<u>Id.</u> at 131, 556 S.E.2d at 98.  It was "undisputed that Quintain

22

knew of CNR's pipeline prior to acquiring these leases." Id.
Nevertheless, Quintain demanded that CNR move the pipeline at
CNR's cost inasmuch as the conveyance was interfering with
Quintain's planned mining operations.  CNR was willing to move
the pipe line but demanded that Quintain pay all associated
costs.

         After noting that CNR was required to relocate its
pipeline to the extent that it interfered with the severance of
coal from the parcel, the supreme court of appeals observed
additionally as follows:

> There is one additional question that must be resolved,
> however. Who should pay the cost for the relocation of
> the pipeline on the Vinson and Baach tracts? . . . The
> right-of-way deeds are silent as to who should bear the
> cost of such relocation. Under these circumstances, we
> find that Quintain should bear this cost. Quintain knew
> of the existence of the pipeline when it acquired its
> right to mine the property in question. Moreover,
> Quintain is the party who benefitted from the
> pipeline's relocation.

Id. at 134, 556 S.E.2d at 101 (emphasis supplied) (footnote
omitted).  The supreme court of appeals further emphasized the
underscored analysis by quoting at length from Minard Run Oil Co.
v. Pennzoil Co., 419 Pa. 334, 336, 214 A.2d 234, 235 (1965):

> [F]or the plaintiff to demand that the defendants pay
> for what is being done for . . . [plaintiff's] own
> benefit would be like asking the miller to pay the
> farmer for the flour he has produced from the farmer's
> wheat. The lowering of the defendants' pipeline can in

23

> no way increase the defendants' profits or facilitate
> the discharge of their function which is to transport
> oil in a pipe. The status quo was entirely satisfactory
> to them. They in no way sought a change in the existing
> conditions. It is the plaintiff who desires to alter
> the status quo for its benefit (even though, by
> deepening the bed of the defendants' pipeline it will
> be less subject to damage), and it should, therefore,
> be the plaintiff's obligation to pay for the
> achievement of its desire.

Id.[13]

Similarly, Fountain Place seeks to upset the status quo that has existed for at least some period of time, by demanding the relocation or burial of BR-886/1875.  (See Def.'s Cntrclm. WHEREFORE cls. ¶¶ 1-2 (requesting the court to "1. Issue a mandatory injunction compelling the Plaintiffs to forthwith commence work installing said BR-886 pipeline beneath the 'middle

---

[13]The majority opinion appears to emphasize the significance of one upsetting the status quo, over and above that same party being cognizant of the pipeline's location when it acquired its rights to the property.  It appears that the supreme court of appeals would have required Quintain to pay the pipeline relocation costs even absent Quintain's knowledge of the pipeline's location when it acquired its rights to mine the area.

The court thus understands the decision in Quintain to require one requesting relocation of a gas line, in a manner upsetting the status quo, without any benefit to the pipeline owner, to be a separate and independent basis upon which to shift the relocation costs to the party requesting the move.  But see id. at 139, 556 S.E.2d at 139 (Maynard, J., dissenting) (stating "The majority concludes that Quintain should pay because (1) Quintain was aware of the existence of the pipeline when it acquired its right to mine and (2) Quintain benefitted from the relocation.") (emphasis supplied); but see also Equitable Gathering Equity, LLC v. Dynamic Energy, 2009 WL 37186, at *3 (S.D. W. Va. Jan. 7, 2009) (unpublished disposition).

haulroad' on Defendant's property; [and] 2. To issue a
Declaratory Judgment in its favor that Plaintiffs are legally
required to bear the cost of placing BR-886 beneath its haulroads
at a safe depth.").  The parties dispute when, if ever, the
disputed BR-886/1875 pipeline segment was relocated.  Plaintiffs
appear to suggest that the disputed portion has been in place
since 1992.  Fountain Place contends that the move occurred in or
about 2001.[14]  For purposes of summary judgment, there is no

_____

[14]Hurley speculates concerning relocation of the disputed
BR-886/1875 pipeline section ("disputed pipeline section").  At
various points in the record, he suggests, inter alia, that (1)
the disputed pipeline section was moved "after the [2001]
fire[;]" (2) that he found in Summer 2008 that a six inch
pipeline had been installed "over our haulroads[,]" without any
indication respecting how long the pipeline had been in the area,
(3) that plaintiffs were replacing pipelines to their gas
metering system on the subject property in 2007.  While Hurley
professes familiarity with the pipelines on the subject property
generally, it is apparent that he lacks personal knowledge
concerning the historical location of the disputed pipeline
section.
    Fountain Place also contends that Hopkins testified "that
within the last 3 years work was carried out on the pipeline
running from the D-4 Well over to the D-11 Well" as pictured on
Exhibit 6 to the Hopkins deposition.  (Def.'s Supp. Br. at 2).
According to the scale listed on Exhibit 6, the distance between
the two referenced wells spans thousands of feet.  In view of the
failure to more particularly identify the sections of pipeline at
issue, the assertions by Fountain Place amount to mere
speculation.
    The same failure of particularity plagues the Preece
affidavit.  Preece states at one point that "the 6 inch pipeline
shown in Exhibit 6 . . . was not there [in 2001] . . . ."  He
then states, however, that "after the fire was put out the gas
line company replaced the 8 inch pipeline with a 6 inch pipeline
and ran the existing 6 inch pipeline . . . ."  Preece's reference
                                           (continued...)

genuine issue of material fact that the disputed portion has been in place since in or about 2001.  Inasmuch as plaintiffs gain no benefit from Fountain Place's requested relief, the decision in Quintain obligates Fountain Place to pay the costs associated with burial or relocation.

It is true that Fountain Place contends that plaintiffs have exceeded the scope of the easement granted in the CCC Lease such that BR-886/1875 must be relocated or buried at plaintiffs' cost.  But even the proviso -- that "[a]ll pipe lines . . . shall be buried . . . at a safe depth when crossing under . . . haulroads" -- is of no assistance to Fountain Place.  There is no evidentiary basis to conclude that any of the paths or partial clearings in the vicinity of Location No. 1 qualify as a "haulroad" as contemplated by the proviso.  Indeed, Fountain Place concedes that "[t]here is no dispute that the haulroads were not well traveled roads and were used on an as needed basis." (Def.'s Supp. Br. at 4).  At most, the record permits only the conclusion that there is a clearing of some dimension, for some unspecified distance, that (1) was used by plaintiffs or

---

[14](...continued)
to a non-existent, and then existing, 6 inch pipeline leads the court to conclude that Fountain Place has failed, as a matter of law, to offer more than a scintilla of evidence that the disputed pipeline section was moved at any time following its original placement, whenever that may have occurred.

their predecessors to transport replacement pieces of pipeline
for repairs, winched in by bulldozer as the way was cleared, and
(2) allowed for limited travel by four wheel drive vehicles.
These limited uses do not a haulroad make.

        Moreover, assuming Fountain Place is privileged to
enforce the CCC Lease against plaintiffs, and that it can further
demonstrate that plaintiffs are obligated to relocate BR-
886/1875, the decision in <u>Quintain</u> appears to require Fountain
Place to also identify an associated cost-shifting provision in
the CCC Lease or elsewhere in the chain of title:

> We have determined . . . that the language of the right
> of way deeds over the Vinson and Baach tracts do[]
> require CNR to relocate its pipeline to facilitate
> mining.  <u>The record is clear, however, that from the</u>
> <u>outset CNR was willing to relocate its pipeline if</u>
> <u>Quintain would bear the cost. We have also determined</u>
> <u>in this opinion that, under the Vinson and Baach deeds,</u>
> <u>CNR was not required to bear the financial burden of</u>
> <u>relocating its pipeline from those tracts</u>.
> Consequently, Quintain cannot show that CNR exceeded
> the scope of the Vinson or Baach easements merely by
> its refusal to pay for the relocation.

<u>Id.</u> at 137, 556 S.E.2d at 104.

        The same analysis applies here.  As in <u>Quintain</u>,
plaintiffs seem to agree that BR-886/1875 must be relocated to
allow use of the haulroad or pathway planned or sought by
Fountain Place through Location No. 1.  (Compl. ¶ 32 ("If

27

Defendant wishes to continue to cross the BR-886 Pipeline . . . a proper pipeline crossing or relocation of . . . BR-886 . . . would be necessary."). Further, as in Quintain, Fountain Place has identified no provision in the CCC Lease or elsewhere in the chain of title that would impose upon plaintiffs the relocation or burial costs. Fountain Place's contention is thus not meritorious.

Respecting the disposition of the pending motions in view of this ruling, Counts One and Two of the complaint seek, respectively, (1) an injunction requiring Fountain Place and its agents to cease and desist from any further surface activities upon, over, under, or related to BR-886/1875 until such time as a proper and safe crossing is constructed by plaintiffs, and (2) a declaration that Fountain Place must pay for the burial and/or relocation of BR-886/1875.

With respect to the relief sought on Count One, it is not contemplated that Fountain Place will further excavate respecting BR-886/1875 at Location No. 1 or traverse under it prior to burial or relocation. Accordingly, the court ORDERS that Count One be, and it hereby is, dismissed as moot, along with Fountain Place's motion for partial summary judgment as to Count One of plaintiffs' complaint, that portion of the

28

plaintiffs' motion seeking summary judgment as to Count One, and plaintiffs' motion and renewed motion for a preliminary injunction.

It is further ORDERED that the portion of plaintiffs' motion seeking summary judgment as to Count Two be, and it hereby is, granted, and that Fountain Place's motion for summary judgment as to Count Two, be and it hereby is, denied.

As noted, Fountain Place's counterclaim requests the court to "1. Issue a mandatory injunction compelling the Plaintiffs to forthwith commence work installing said BR-886 pipeline beneath the 'middle haulroad' on Defendant's property; [and] 2. To issue a Declaratory Judgment in its favor that Plaintiffs are legally required to bear the cost of placing BR-886 beneath its haulroads at a safe depth."  (See Def.'s Cntrclm. WHEREFORE cls. ¶¶ 1-2).

Respecting paragraph 1, it is the court's belief that plaintiffs will, upon receipt of Fountain Place's payment, commence work forthwith to bury and/or relocate BR-886/1875 in view of the apparent importance of the contemplated cell tower to the citizens of Logan County.  (See Def.'s Resp. to Pls.' Mot. for Prelim. Injunc, Ex. A, Aff. of David Chorba, Managing Member

29

of Paradigm at 1-2 (noting the Public Service Commission grant for the cell tower project was the subject of "expedited approval . . . to [1] assure that Logan County would have Cellular . . . [and] 911 emergency services, [2] provide infrastructure for the WV Interoperability System (Home Land Security), and [3] connect the new tower and cell service at Chief Logan State Park Convention Center to the land line network so it will operate" and further noting that the cell tower will be constructed on "a high traffic commercial parcel that currently does not have 911 and emergency service communications and the cell tower will remedy that serious public safety concern . . . .").  The court thus deems the relief sought in paragraph 1 to be moot even if Fountain Place was entitled to judgment.  Respecting the relief sought in paragraph 2 of the counterclaim, the court has ruled adversely to Fountain Place.  The court, accordingly, ORDERS that Fountain Place's counterclaim be, and it hereby is, dismissed.

                              III.


        Based upon the foregoing discussion, the court, accordingly, ORDERS as follows:

    1.    That Count One of plaintiffs' complaint be, and it hereby is, dismissed as moot;

                              30

2.    That Fountain Place's counterclaim be, and it hereby
      is, dismissed;

3.    That Fountain Place's motion for partial summary
      judgment as to Count One of plaintiffs' complaint be,
      and it hereby is, denied as moot;

4.    That Fountain Place's motion for summary judgment as to
      Count Two of plaintiffs' complaint be, and it hereby
      is, denied;

5.    That the portion of the plaintiffs' motion for summary
      judgment seeking declaratory relief as to Count Two of
      plaintiffs' complaint be, and it hereby is, granted,
      and in all other respects denied as moot;

6.    That plaintiffs' motion and renewed motion for a
      preliminary injunction be, and they hereby are, denied
      as moot.

The Clerk is directed to forward copies of this written
opinion and order to all counsel of record.

DATED:  March 5, 2010

John T. Copenhaver, Jr.
United States District Judge

31