```
            UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF WEST VIRGINIA

                    AT CHARLESTON
```

EQT GATHERING EQUITY, LLC,
a Delaware limited liability company, and
EQT PRODUCTION COMPANY
a Pennsylvania corporation,

      Plaintiffs

v.                                  Civil Action No. 2:09-0069

FOUNTAIN PLACE, LLC,

      Defendant.

## MEMORANDUM OPINION AND ORDER

Pending are the parties' cross motions for summary judgment filed December 14, 2011.

### I.

A.    The Subject Property and the Chain of Title

Prior to 1944, Island Creek Coal Company ("Island Creek") was the owner in fee of the property in Logan County which is the subject of this dispute ("the subject property"). In an "Agreement of Lease" dated April 13, 1944 ("CCC lease"), Island Creek leased to Columbian Carbon Company ("CCC") 30,380

acres of oil and gas rights on parcels that included the subject property. (Stip. ¶ 2; id., ex. B at 1 ("CCC Lease at ---")).

CCC was given broad rights to explore for, produce and transport oil and gas on the subject property, "together with adequate and appropriate rights of way and easements for such purpose." (CCC Lease ¶¶ 2, 3). Respecting the issue of successors, the CCC lease provides as follows:

> This lease and all the terms, provisions and covenants herein contained shall extend and inure to and be binding upon and for the benefit of the successors and assigns of the respective parties hereto . . . .

(CCC Lease ¶ 22).

On December 16, 1965, Island Creek sold to Georgia-Pacific Corporation ("Georgia-Pacific") its surface rights to most of the land it owned in Logan County, including the subject property ("Georgia-Pacific Deed"). The Georgia-Pacific Deed provided that the conveyance was subject to "[t]he right, title and interest of . . . [CCC] and its successor, Cities Service Company, under . . . [the CCC Lease] . . . and [a] January 16, 1955 [lease] . . . ." (Georgia-Pacific Deed ¶ 2).

On November 12, 1968, Columbian Fuel Corporation ("CFC"), the successor in interest to CCC under the CCC Lease,

2

dissolved.  The rights of CCC and CFC under the CCC Lease were ultimately transferred, on an unstated date by an unidentified successor entity, to EQT Production Company ("EPC"), a Pennsylvania corporation engaged in the production and sale of natural gas.  EPC's fellow plaintiff in this action is EQT Gathering Equity, LLC ("EGE"), a Delaware limited liability company with its principal place of business in Pennsylvania.  Defendant Fountain Place, LLC ("Fountain Place"), alleges, and plaintiffs concede, that one of EPC's predecessors in interest, in existence at least between approximately 1997 through perhaps as early as 2001, was an entity known as Eastern States Oil & Gas, Inc. ("Eastern").[1]

On December 20, 1996, Georgia-Pacific conveyed several parcels to Monterra Development Corporation ("Monterra Development"), including the subject property.  The conveyance was made subject to "[a]ll easements, rights of way . . . and

---

[1] The parties offer very few details respecting Eastern.  Fountain Place suggests Eastern was "the owner of the pipeline" at issue in this action during a time in the late 1990s when it alleges, as discussed more fully infra, Monterra Marketplace, Inc. ("Monterra Marketplace") deposited fill material over the pipeline.  (Def.'s Resp. at 3).  Plaintiffs concede that Eastern was one of their "predecessor[s]-in-interest" which served "as the owner of the pipeline and easement at the time some or all of the dirt was placed" over the pipeline.  (Pls.' Reply at 2).
    The precise relationship between plaintiffs and Eastern, and whether there was a merger involving the two or whether there was an assignment of any claims or rights between them, is unstated.

other . . . encumbrances of record" and "[p]rior . . . conveyances of mineral rights or mineral leases of every kind and character." (Stip., ex. D at 2 and I). Eleven days later, on December 31, 1996, Monterra Development sold the subject property to Monterra Marketplace, with the "conveyance . . . made subject to existing . . . private rights and easements . . . ." (Id. ¶ 5; id., ex. E at 1). On August 27, 1999, Monterra Development filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On September 10, 1999, Monterra Marketplace did likewise.

Plaintiffs assert that, beginning at some point in 1999, agents of Fountain Place, a West Virginia limited liability company, began conducting survey work on the subject property. On February 8, 2001, Monterra Marketplace, while still in bankruptcy, conveyed the subject property to Fountain Place. See In re: Monterra Market Place, No. 2:99-bk-21651 (Bankr. S.D. W. Va. Aug. 27, 1999). A series of orders entered by the United States Bankruptcy Court for the Southern District of West Virginia, only two of which are relevant here, permitted the sale. Specifically, the deed from Monterra Marketplace to Fountain Place provides as follows:

> This deed is made subject to the conditions of that certain Agreement of Purchase and Sale dated June

4

> 10, 1999 except as modified by that certain Amended Omnibus Order on Sale of "Fountain Place Mall" of the Untied States Bankruptcy Court for the Southern District of West Virginia dated November 1, 2000, and that certain Order permitting Closing on the Amended Omnibus Order on Sale of FountainPlace [sic] Mall [e]ntered . . . February 8, 2001 which are attached hereto . . . and made a part of this deed . . . .
>
>         . . . .
>
> This conveyance is made pursuant to the Bankruptcy Court Orders, which specifically provide that this sale and conveyance <u>shall be and accordingly is free and clear of all liens[,] claims (including Lis Pendens), interests, encumbrances and other charges, with all liens, claims, interest, encumbrances and other charges attaching to the proceeds of sale as provided in the Bankruptcy Court Orders</u>.

(Deed at 7-8 (emphasis added).  The referenced orders are in accord with the terms attributed to them by the deed, but the "conditions of that certain Agreement of Purchase and Sale dated June 10, 1999," referred to in the deed, have not been presented to the court.  The November 1, 2000, order provides as follows:

> The Court . . . found [at an earlier hearing] that (i) all parties in interest received notice of the Motion to Sell Fountain Place Mall in accordance with Bankruptcy Rule 2002, and (ii) the only objections to the sale of the Subject Property to Fountain Place related to the distribution of proceeds from such sale. The Court permits and authorizes and hereby ORDERS that the Debtor shall be permitted to sell the Subject Property . . . to Fountain Place <u>free and clear of any and all liens, claims, interests and encumbrances and other charges</u> . . . .

(Am. Omnibus Ord. at 5 (Bankr. S.D. W. Va. Nov. 1, 2000) (emphasis added); <u>see</u> <u>also</u> <u>id.</u> at 6 (reiterating the directive

that the sale be "free and clear of any and all liens, claims, interests and encumbrances and other charges . . . ."; (Order Permitting Closing on Am. Omnibus Ord. at 2 (Bankr. S.D. W. Va. Feb. 8, 2001) (using same free-and-clear language).

While its significance, if any, remains clouded, the parties dispute whether Eastern received notice of the orders and precursor proceedings relating to the subject property.[2]  It is noted that the conveyance was also made subject to "all exceptions, reservations and conditions contained in . . . all prior instruments of record pertaining to the real estate . . . ."  (Stip., ex. F at 7-8).

---

[2]Fountain Place asserts that Eastern appeared on the creditor matrix in the Monterra Development bankruptcy.  It further states "[t]he Plaintiffs' predecessor, 'Eastern . . . ,' should have filed its claim with the Bankruptcy Court, and may have done so."  (Def.'s Memo. in Resp. at 3 (emphasis added)).  It is noted that the February 8, 2001, order of the bankruptcy court specifically found that "proper notice [of the free-and-clear sale of the subject property] was sent to all interested parties, including but not limited to, all parties in interest in the . . . Monterra Development Estate."  (Ord at 8).  Plaintiffs add only that, "[u]pon information and belief," Eastern never received notice of the bankruptcy proceeding.  They appear to contend that by 2000 Eastern was no longer at the address listed on the creditor matrix.  It appears undisputed that neither plaintiffs nor any of its predecessors in interest other than potentially Eastern received notice of the bankruptcy proceedings.  The parties otherwise devote very little briefing to the impact of the bankruptcy proceedings.

**B.   Background of the Parties' Dispute**

EPC owns, and EGE operates, the DC-4 pipeline, a six-inch gas transmission facility that crosses over the subject property.  On a date unstated in the record, Monterra Marketplace, Fountain Place, or both, deposited and "benefit[ted] from the deposit of approximately 30 feet of fill over the DC-4 Pipeline without" plaintiffs' permission.  (Compl. ¶ 18).  Plaintiffs deemed the fill placement to create an unsafe condition, affecting both the integrity of DC-4 and those persons and properties in its proximity.  Despite notice and warnings from plaintiffs respecting the attendant risks created by the condition and the necessity of pipeline relocation, Fountain Place refused to take any steps to remedy the condition.  EGE thus unilaterally relocated DC-4, in according to defendant's counsel 2007-08, at a cost of $169,552.57.

On January 26, 2009, plaintiffs instituted this action alleging five claims against Fountain Place.[3]  Counts One and Two involve a pipeline different from DC-4.  Those two claims, along with Fountain Place's counterclaim, were fully adjudicated by a

---

[3]In actuality, there are six claims pled.  Count Six, however, is entitled "INTENTIONAL CONDUCT."  (Compl. ¶ 49-52).  The court does not understand this Count to allege a cognizable claim.  It appears only to lodge a request for punitive damages.

7

March 5, 2010, memorandum opinion and order.[4] Counts Three, Four, and Five involve either the DC-4 pipeline or both pipelines.

Count Three alleges that Fountain Place, through the alleged fill placement, "altered the status quo of the DC-4 Pipeline . . . ." (Compl. ¶ 37). Plaintiffs assert that this alleged status quo change, along with Fountain Place benefitting from it by not having to incur the relocation expense, gives rise to a right of reimbursement under Quintain Development, LLC v. Columbia Natural Resources, Inc., 210 W. Va. 128, 556 S.E.2d 95 (2001), and its progeny.

Count Four alleges a negligence claim. Plaintiffs assert that Fountain Place breached the duty of care owed to them

---

[4]The parties previously agreed to a streamlined discovery process respecting the counterclaim and Counts One and Two. According to an April 24, 2009, order, it was agreed that "the evidentiary record by which the parties wish the court to resolve the pending dispositive motions [involving the counterclaim and Counts One and Two] be . . . deemed to consist of the documentary evidence and affidavits submitted heretofore, supplemented by the deposition of Charles Hopkins, to be taken no later than May 6, 2009, and any further discovery taken by agreement and concluded no later than May 16, 2009." EQT Gathering Equity, LLC v. Fountain Place, LLC, No. 2:09-0069, Ord. at 1 (S.D. W. Va. Apr. 24, 2009). The March 5, 2010, memorandum opinion and order dismissed the counterclaim, dismissed Count One as moot, and granted plaintiff's judgment as a matter of law respecting the declaratory relief sought as to Count Two. See EQT Gathering Equity, LLC v. Fountain Place, LLC, No. 2:09-0069, slip op. at 6 n.3 (S.D. W. Va. Mar. 5, 2010).

with respect to both pipelines. Count Five alleges a trespass claim related to Fountain Place's actions involving both pipelines.

Fountain Place seeks summary judgment as to Counts Three, Four, and Five. Plaintiffs have moved for summary judgment respecting the allegations of Count Three concerning the DC-4 pipeline.

## II.

A.  Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-

finder could return a verdict for the non-movant. Id. The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party

opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

B.   Fountain Place's Motion for Summary Judgment

The essence of Counts Three, Four, and Five is that Fountain Place is responsible for the DC-4 relocation costs. This is based upon plaintiffs' allegation that Fountain Place deposited fill material on top of the pipeline after purchasing the subject property from Monterra Marketplace on February 8, 2001.  Fountain Place, however, asserts that Monterra Marketplace deposited the fill material prior to closing of the sale.

Fountain Place relies in particular upon an affidavit submitted by Rick Dalton, a former construction supervisor for Monterra Marketplace.  Dalton avers that in 1997 or 1998, at a time prior to the filing of Chapter 11 petitions by Monterra Development and Monterra Marketplace, Monterra Marketplace deposited approximately 30 feet of fill material over a roughly

11

600 foot section of DC-4. He further testified that he worked for Fountain Place from 2001 until the early part of 2002 and noted no fill material was placed on the pipeline during that time period. He also observed that the fill over the pipeline appears to be at essentially the same depth as Monterra Marketplace left it as late as 1999. (<u>See</u> <u>also</u> Rep. of Prof. Surveyor Lantz G. Rankin at 1 (Sept. 10, 2010) ("Based on topographical maps dated November 7, 2001, and January 22, 2007, it is my opinion the elevation of the valley fill over . . . [DC-4] was the same on January 22, 2007 as it was on November 7, 2001.").[5]

     Plaintiffs offer two responsive contentions. First, they assert that there is a genuine issue of material fact respecting who placed fill material over DC-4. For example, they cite the testimony of their former district superintendent David Jewell. Jewell's testimony implies that at least three feet of fill material was placed over DC-4 by Fountain Place after it purchased the subject property from Monterra Marketplace. This

---

    [5]Fountain Place's denial of responsibility is supported by other evidence. (<u>See</u>, <u>e.g.</u>, Dep. of Jude Blevins at 48 (EGE employee stating about the fill material "I don't know who put it there . . . ."); (Dep. of Thomas Cook at 8 (EGE employee stating "I know there is dirt on it, but other than that, that's it . . . . I don't know nothing about none of it."); (Dep. of Wetzel Davis at 8 (EGE employee recounting that he saw Fountain Place agents moving dirt but not over the pipe)).

testimony is sufficient to create a genuine issue of material fact respecting the proper entity to be charged with the fill placement over DC-4.

Second, however, plaintiffs contend that this extant factual issue need not be resolved inasmuch as "the resulting trespass and interference with . . . [DC-4] existed at the time that . . . [Fountain Place] purchased the property and . . . [Fountain Place] must remedy the trespass and interference." (Pls.' Memo. in Oppos. at 2). Plaintiffs rely upon West Virginia law, asserting that a purchaser at a judicial sale holds title in privity with the former owner. They couple this observation with the contention that "the doctrine of caveat emptor applies and . . . [Fountain Place] . . . . is responsible to remedy the interference." (Pls.'s Memo. in Supp. at 14).

Plaintiffs cite the per curiam decision in Naab v. Nolan, 174 W. Va. 390, 327 S.E.2d 151 (1985). The decision in Naab addresses adverse possession and prescriptive easements. It does not involve attribution to a passive, succeeding land owner of the consequences of his predecessor's earlier active trespass. Nevertheless, Naab includes this isolated statement: "An elementary principle of property law states that the owner of a burdened premise is bound by the actions or inactions of his

13

predecessors in title." Id. at 392, 327 S.E.2d at 153. The cited rule is unaccompanied by any citation of authority.

Assuming plaintiffs are correct, namely, that Fountain Place is obliged under state law to pay for the relocation costs merely because it owned the property at the time plaintiffs incurred the expense, the impact of the bankruptcy court's orders must be considered. But neither the Naab issue nor the effect of the bankruptcy court's two orders are adequately addressed by the parties. Respecting the liability of Fountain Place for Monterra Marketplace's alleged trespass, the citation to dicta in a single per curiam decision is an insufficient basis upon which to enter judgment as a matter of law in the movant's favor. Respecting the broad reading of the bankruptcy court's two orders urged by Fountain Place, a number of predicate facts and the necessary supporting legal discussion are missing. As noted, it is unclear if Eastern assigned any claim it may have had against Monterra Marketplace or Fountain Place to plaintiffs. Additionally, in case it matters, it is uncertain if Eastern filed a claim in the Monterra Development or Monterra Marketplace proceedings. Also in doubt is whether Eastern received notice of the bankruptcy court's orders, or their precursor proceedings, and whether the debtors or possibly Eastern itself bore responsibility for any failure of notice.

14

The court deems it unnecessary, however, to address these and other difficult factual and legal questions at this time. A trial-worthy issue is presented, namely, whether Fountain Place deposited, or had any role in the deposit of, any of the fill material over DC-4. If Fountain Place is found to have deposited, or played a significant role in the deposit of, the fill material, its liability on Counts Three, Four, and Five would be clear enough irrespective of Monterra Marketplace's pre-sale actions.

Based upon the foregoing discussion, it is ORDERED that Fountain Place's motion for summary judgment be, and it hereby is, denied.

C.   Plaintiffs' Motion for Summary Judgment

Plaintiffs seek summary judgment only as to Count Three. They contend that, even if the fill took place while Monterra Marketplace was the owner, Fountain Place's knowledge of the existing fill material over DC-4, along with benefitting from the relocation of DC-4, is sufficient to shift the associated costs to it under Quintain Development, LLC v. Columbia Natural Resources, Inc., 210 W. Va. 128, 556 S.E.2d 95 (2001).

The decision in <u>Quintain</u> requires one requesting relocation of a pipeline, in a manner upsetting the <u>status quo</u>, without any benefit to the pipeline owner, to pay the associated relocation costs.  <u>See also</u> <u>Equitable Gathering Equity, LLC v. Dynamic Energy</u>, No. 5:07-cv-00725, 2009 WL 37186, at * (S.D. W. Va. Jan. 7, 2009) (same).  Neither <u>Quintain</u> nor <u>Dynamic Energy</u>, however, involved relocation liability imposed upon a successor landowner who remains entirely passive, namely, not interfering with the <u>status quo</u> directly related to the pipeline nor requesting its relocation.  <u>See</u>, <u>e.g.</u>, <u>Dynamic Energy</u>, 2009 WL 37186, at * 7 ("[T]he cost falls on the party that knew of the existence of the pipelines, <u>altered the status quo</u>, and seeks to benefit from any relocation.") (emphasis added).

It is thus the case that a jury finding exonerating Fountain Place from any responsibility for placing the fill would warrant judgment being entered in its favor as to all plaintiffs' claims respecting the independent liability of Fountain Place for that misconduct, though that does not resolve the legal issue of its alleged successor liability.  On the final page of its memorandum in support of summary judgment, however, plaintiffs additionally state as follows:

[R]elocation of the pipeline was further <u>necessitated</u>

16

> **by Defendant's development of the subject property** as admitted by Fountain Place Member and co-owner, Everett Hanna and evidenced by correspondence to David Jewell from Defendant's Project Manager.  See Exh. I at pp. 21 and correspondence from Gary Corns dated November 26, 2001 attached to Plaintiffs' Motion as Exh. R.4 ("Thank you for your patience with us as we're attempting to finalize our necessary realignment of your gas transmission line at the Fountain Place Mall.").

(Pls.' Memo. in Supp. at 16 (emphasis added)).  If, as plaintiffs suggest, Fountain Place at least implicitly requested that DC-4 be relocated, plaintiffs would come within the rule of shifted-cost liability set forth in Quintain and Dynamic Energy.  It is thus necessary to closely examine the portions of the evidentiary record found in the aforementioned excerpt.

Exhibit I is a portion of the deposition of Fountain Place's Everett Hanna concerning a conversation he had with Gary Corns.  It is asserted by plaintiffs that Corns was Fountain Place's Project Manager at some unstated time:

> Q   Okay. Now, did you ever have any conversations about anybody about this pipeline being buried?
>
> A   Yes.
>
> Q   [W]ho did you have conversations with?
>
> A   Gary Corns.
>
> Q   What did you and Gary Corns discuss?
>
> A   He told me that he had talked to someone and they needed $10,000.00 to move the line.

17

> Q     Do you know why the line needed to be moved?
>
> A     Because of future development.
>
> Q     Future development by Fountain place; is that correct? Future development by Fountain place, not Monterra?
>
> A Yes.

(Dep. of Everett Hannah at 21). One of the difficulties with the excerpt is that it fails to provide a time frame for the discussions between Hanna and Corns. It also fails to designate the location of the section of the line that was to be moved.

Those concerns aside, Fountain Place asserts that both the Hanna testimony and the referenced letter from Corns at Exhibit R do not support the proposition for which they are offered by plaintiffs. Plaintiffs have not met that assertion in their reply.

The court is thus unable to conclude as a matter of law that Fountain Place actively or implicitly sought to disturb the status quo existing on the subject property. While both Quintain and Dynamic Energy may ultimately serve as a basis for imposition of liability on Count Three if, by example, a jury concludes that Fountain Place deposited fill material over DC-4, and hence altered the status quo in a manner requiring pipeline relocation,

18

neither decision supports the imposition of liability as a matter of law on that count at this time.

## III.

Based upon the foregoing discussion, it is ORDERED as follows:

1. That plaintiffs' motion for summary judgment as to Count Three be, and it hereby is, denied; and

2. That defendant's motion for summary judgment be, and it hereby is, denied.

This case will proceed according to the revised scheduling order entered this same day.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: March 3, 2011

John T. Copenhaver, Jr.
United States District Judge

19