UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON


EQT GATHERING EQUITY, LLC,
a Delaware limited liability company, and
EQT PRODUCTION COMPANY
a Pennsylvania corporation,

       Plaintiffs

v.                                        Civil Action No. 2:09-0069

FOUNTAIN PLACE, LLC,

       Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>


       Pending are defendant Fountain Place, LLC's ("Fountain Place") motions (1) for judgment as a matter of law, and (2) for judgment as a matter of law as to Counts Three, Four, and Five of the amended complaint based solely on the statute of limitations, filed December 1, 2012.


I.


A.   The Subject Property and the Chain of Title

       Much of the discussion in this section constitutes undisputed factual background taken from the record and prior rulings of the court.

Prior to 1944, Island Creek Coal Company ("Island Creek") was the owner in fee of the property in Logan County which is the subject of this dispute ("the subject property"). In an "Agreement of Lease" dated April 13, 1944 ("CCC lease"), Island Creek leased to Columbian Carbon Company ("CCC") 30,380 acres of oil and gas rights on parcels that included the subject property.  (Agd. Stip. of Facts ¶ 2 (Mar. 10, 2009); id., ex. B at 1 ("CCC Lease at ---")).

CCC was given broad rights to explore for, produce and transport oil and gas on the subject property, "together with adequate and appropriate rights of way and easements for such purpose." (CCC Lease ¶¶ 2, 3).  This easement-creating language, as a matter of law, gave rise to an obligation on the part of Island Creek, and its successors under the CCC lease, to avoid interfering with the nonpossessory easement rights granted to CCC and its successors.  See, e.g., Newman v. Michel, 224 W. Va. 735, 740, 688 S.E.2d 610, 615 (2009) (stating that "'[a]n easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement.'") (quoting Restatement (Third) of Property § 1.2(1) (2000)); Kell v. Appalachian Power Co., 170 W. Va. 14, 17, 289 S.E.2d 450, 453

2

(1982)("The grantor-owner of the land retains the right to make any reasonable use of the land subject to the easement so long as that use is not inconsistent with the rights of the grantee."); John W. Fisher, II, A Survey of the Law of Easements in West Virginia, 112 W. Va. L. Rev. 637, 642 (2010).

The easement granted by the CCC lease was appurtenant in nature.[1]  This is evidenced, in part, from the language employed in the CCC lease:

> This lease and all the terms, provisions and covenants herein contained shall extend and inure to and be binding upon and for the benefit of the successors and assigns of the respective parties hereto
> . . . .

(CCC Lease ¶ 22).  Irrespective of that continuing character, however, the successors in interest to Island Creek and CCC were explicitly bound to the easement grant in the chain of title.

On December 16, 1965, Island Creek sold to Georgia-Pacific Corporation ("Georgia-Pacific") its surface rights to

---

[1] See, e.g., Newman, 224 W. Va. at 742, 688 S.E.2d at 617 (2009) ("The main features of an easement appurtenant are that there must be both a dominant and servient estate; the holder of the easement must own the dominant estate; the benefits of the easement must be realized by the owner of the dominant estate; and these benefits must attach to possession of the dominant estate and inhere to and pass with the transfer of the title to the dominant estate."); see also id. ("Many jurisdictions, including this Court, have shown a strong constructional preference for finding easements to be appurtenant rather than in gross.").  Inasmuch as the easement in question is properly characterized as appurtenant, it runs with the land.

most of the land it owned in Logan County, including the subject property ("Georgia-Pacific Deed").  The Georgia-Pacific Deed provided that the conveyance was subject to "[t]he right, title and interest of . . . [CCC] and its successor, Cities Service Company, under . . . [the CCC Lease] . . . and [a] January 16, 1955 [lease] . . . ."  (Georgia-Pacific Deed ¶ 2).

On November 12, 1968, Columbian Fuel Corporation ("CFC"), the successor in interest to CCC under the CCC Lease, dissolved.  The rights of CCC and CFC under the CCC Lease were ultimately transferred from a predecessor entity to plaintiff EQT Production Company ("EPC"), a Pennsylvania corporation engaged in the production and sale of natural gas.  EPC's fellow plaintiff in this action is EQT Gathering Equity, LLC ("EGE"), a Delaware limited liability company with its principal place of business in Pennsylvania.  Fountain Place alleges, and plaintiffs concede, that one of EPC's predecessors in interest, in existence at least between approximately 1997 through perhaps as early as 2001, was an entity known as Eastern States Oil & Gas, Inc. ("Eastern").

On December 20, 1996, Georgia-Pacific conveyed several parcels of the subject property to Monterra Development Corporation ("Monterra Development").  The conveyance was made subject to "[a]ll easements, rights of way . . . and other . . .

4

encumbrances of record" and "[p]rior . . . conveyances of mineral rights or mineral leases of every kind and character."  (Stip., ex. D at 2 and I).  Eleven days later, on December 31, 1996, Monterra Development sold the subject property to Monterra Marketplace, with the "conveyance . . . made subject to existing . . . private rights and easements . . . ."  (<u>Id.</u> ¶ 5; <u>id.</u>, ex. E at 1).

On August 27, 1999, Monterra Development filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  On September 10, 1999, Monterra Marketplace did likewise. On February 8, 2001, Monterra Marketplace, while still in bankruptcy, conveyed the subject property to Fountain Place.  <u>See In re: Monterra Market Place</u>, No. 2:99-bk-21651 (Bankr. S.D. W. Va. Aug. 27, 1999).  Fountain Place has never alleged that it is somehow free of the obligations found in the CCC Lease.

In paragraph 9 of the amended complaint, the following allegation appears:

> [Plaintiffs have been conducting activities on the
> subject property] pursuant to a certain lease dated
> November 6, 1987, between Island Creek Coal Company, as
> original lessor, and Cities Services Oil and Gas
> Corporation, as original lessee and EPC's predecessor
> in interest (the "Lease"; said land covered by the
> Lease is sometimes hereinafter referred to as the
> "Leased Premises").  The Lease amended a certain lease
> between Island Creek Coal Company and Columbian Carbon

Company, EPC's predecessor in interest.

(Am. Compl. ¶ 9).  In its answer, Fountain Place responds to the allegation as follows:

> With respect to the allegations contained in Paragraph
> 9 of Plaintiffs' complaint, said Defendant admits there
> is a memorandum giving notice of a lease that is
> recorded in the Office of the Clerk of the County
> Commission of Logan County, in Lease Book 36, at Page
> 205. The contents of that lease is unknown to this
> Defendant, but Defendant does allege that all rights
> under said lease are subject to the provisions of that
> certain lease dated April 13, 1944, between Island
> Creek Coal Company and Columbia Carbon Company which
> said Lease is recorded in the aforesaid Clerk's office
> in Lease Book 25, at page 253.

(Ans. at ¶ 5).  Inasmuch as the parties have not indicated that the referenced amendments have any effect on the CCC lease as it relates to this action, the court deems the allegation in the amended complaint to be immaterial.

B.   Background of the Parties' Dispute

EPC owns, and EGE operates, the DC-4 pipeline ("pipeline" or "DC-4"), a six-inch gas transmission facility that crosses over the subject  property.  The evidence at trial, viewed in the light most favorable to plaintiffs, revealed that both Monterra Marketplace and Fountain Place deposited fill over the pipeline without plaintiffs' permission.  For example,

respecting Monterra Marketplace, Ricky Dalton testified that, in the spring of 1998, Monterra Marketplace deposited 25 to 30 feet of fill material over the pipeline.  (Tr. at 121).

Respecting Fountain Place, David Jewell, a superintendent for plaintiffs who worked in their pipeline integrity department, stated as follows concerning an event that occurred on the subject property in November 2001:

> During Thanksgiving, most of my folks went hunting. And one of my operators notified me that there was a dozer working on top of the line, and I went to the site to see what was going on, and the dozer was pushing dirt covering it.  And I had a talk with him and asked him not to do that. I tried to explain the hazards and the dangers of that.

(Tr. at 47 (emphasis added); see also id. at 61 (witness adopting counsel's characterization and reiterating that there was no "doubt in . . . [his]  mind that they were working, pushing dirt over that pipeline . . . .")).

As is indicated by Mr. Jewell's testimony, and the record at multiple other places (see, e.g., Tr. at 6, 29, 42-43, 191, 193), the fill placement appears to have been deemed by plaintiffs to create an unsafe condition, affecting both the integrity of DC-4 and those persons and properties in its proximity.  At least one defense witness, formerly employed by both Monterra Marketplace and  Fountain Place, agreed.  (See,

7

e.g., Tr. at 144 (question on cross examination to Ricky Dalton asking if he knew "it was unsafe to work around an active pipeline" and his response being "[y]es, sir.").  Following years of negotiations between plaintiffs and Fountain Place attempting to agree upon terms governing relocation of the pipeline, EGE unilaterally moved the facility to a safer location in 2008 at a cost of $158,131.80.[2]

On January 26, 2009, plaintiffs instituted this action. On April 15, 2011, they filed, as noted earlier, an amended complaint.  Counts One and Two involve a pipeline different from DC-4.  Those two claims, along with Fountain Place's counterclaim, were fully adjudicated by a March 5, 2010, memorandum opinion and order.[3]

---

[2]The parties at trial stipulated to this amount as the judgment to which plaintiffs would be entitled, with interest running from the date of the judgment, if Fountain Place was found liable on any one or more of Counts Three, Four, and Five.

[3]In a March 5, 2010, memorandum opinion and order, the court dismissed the counterclaim, dismissed Count One as moot, and granted plaintiff's judgment as a matter of law respecting the declaratory relief sought in Count Two.  See EQT Gathering Equity, LLC v. Fountain Place, LLC, No. 2:09-0069, slip op. (S.D. W. Va. Mar. 5, 2010).  Count Two involved another pipeline located elsewhere on the property, namely, BR-886/1875. Plaintiffs asserted that Fountain Place engaged in activities requiring relocation of that pipeline as well, demanding $45,000 to bury or relocate the facility.  The March 5, 2010, memorandum opinion directed that Fountain Place pay for the burial or relocation work associated with BR-886/1875.

8

Count Three alleges that Fountain Place, through the alleged fill placement, "altered the status quo of the DC-4 Pipeline . . . ." (Compl. ¶ 38). Plaintiffs assert that this alleged status quo change, along with Fountain Place benefitting from it by not having to incur the relocation expense, gives rise to a right of reimbursement under Quintain Development, LLC v. Columbia Natural Resources, Inc., 210 W. Va. 128, 556 S.E.2d 95 (2001), and its progeny. Counts Four and Five allege tort claims for negligence and trespass respectively. On November 15, 2011, the court entered the proposed integrated pretrial order, which essentially tracks Counts Three, Four, and Five.

On November 15, 2011, trial commenced. On November 17, 2011, the jury returned its answers to the agreed special interrogatories as follows:

1. Did Monterra Development or Monterra Marketplace, or someone acting on the behalf and at the direction of either of them, place dirt over the DC-4 pipeline?

    __✓__ YES          _____ NO

1A. If you answered "YES" to question 1 above, what is the last date that the placement of dirt by either of the Monterra entities occurred AND the date EQT knew, or by the exercise of reasonable diligence should have known, of that placement?

    March 1998                    February 2001
    DATE OF DIRT PLACEMENT         DATE EQT KNEW, OR BY
                                   REASONABLE DILIGENCE
                                   SHOULD HAVE KNOWN,
                                   OF THE PLACEMENT

2.    Did Fountain Place, or someone acting on its
      behalf and at its direction, place dirt over the
      DC-4 pipeline?

          ____✓____ YES                _____  NO

2A.   If you answered "YES" to question 2 above, what is the
      last date that the placement of dirt by Fountain Place
      occurred AND the date EQT knew, or by the exercise of
      reasonable diligence should have known, of that
      placement?

      ___November 21, 2001___        ___November 21, 2001___
      DATE OF DIRT PLACEMENT         DATE EQT KNEW, OR BY
                                     REASONABLE DILIGENCE
                                     SHOULD HAVE KNOWN,
                                     OF THE PLACEMENT

                        * * *

3.    Do you find by a preponderance of the evidence that
      Fountain Place negligently placed dirt over the
      pipeline and thereby proximately caused the damages
      claimed by EQT?

          _____  YES                ____✓____ NO

4.    Do you find by a preponderance of the evidence that
      Fountain Place trespassed upon EQT's easement by
      placing dirt over the pipeline and thereby proximately
      caused the damages claimed by EQT?

          ____✓____ YES                _____  NO

5.    Do you find by a preponderance of the evidence that
      Fountain Place placed dirt over the pipeline and
      thereby disturbed the status quo to the extent that it
      became reasonably necessary that EQT relocate its
      pipeline?

          ____✓____ YES                _____  NO

(Spec. Interrogs. at 1-2).

Fountain Place now moves for judgment as a matter of law in two separate filings.  The first motion for judgment as a matter of law asserts that (1) plaintiffs' proof at trial only established that Fountain Place was "working over" DC-4 and, "at best, [placed] a de minimis" amount of fill material thereon, (2) plaintiffs failed to present expert testimony that the fill material "created a risk of serious harm to the pipeline's integrity causing it to be relocated," (3) plaintiffs failed to demonstrate that they relocated the pipeline due to either an express or implicit request from Fountain Place, and, (4) inasmuch as the three claims are governed by a two-year limitations period, relief is barred based upon the jury finding that plaintiffs knew, or by reasonable diligence should have known, of Fountain Place's fill placement by November 21, 2001. (Def.'s Mot. for Judg. at 1-2).  The second motion for judgment as a matter of law merely elaborates upon the limitations defense.

11

II.

A.   Governing Standard

Federal Rule of Civil Procedure 50(b) provides as
follows:

> If the court does not grant a motion for judgment
> as a matter of law made under Rule 50(a), the court is
> considered to have submitted the action to the jury
> subject to the court's later deciding the legal
> questions raised by the motion. No later than 28 days
> after the entry of judgment -- or if the motion
> addresses a jury issue not decided by a verdict, no
> later than 28 days after the jury was discharged -- the
> movant may file a renewed motion for judgment as a
> matter of law . . . .  In ruling on the renewed motion,
> the court may:
>
> > (1) allow judgment on the verdict, if the
> > jury returned a verdict;
> >
> > (2) order a new trial; or
> >
> > (3) direct the entry of judgment as a matter
> > of law.

(Fed. R. Civ. P. 50(b)).

The applicable federal standard governing a Rule 50(b)
motion is summarized as follows:

> Under Fed.R.Civ.P. 50(b), the question is whether a
> jury, viewing the evidence in the light most favorable
> to [the nonmovant], "could have properly reached the
> conclusion reached by this jury."  If reasonable minds
> could differ about the result in this case, we must
> affirm the jury's verdict. . . .

12

**Bryant v. Aiken Regional Medical Centers Inc.**, 333 F.3d 536, 543
(4th Cir. 2003) (citations omitted); **International Ground Transp.**
**v. Mayor And City Council Of Ocean City**, 475 F.3d 214, 218-19
(4th Cir. 2007)("When a jury verdict has been returned, judgment
as a matter of law may be granted only if, viewing the evidence
in a light most favorable to the non-moving party (and in support
of the jury's verdict) and drawing every legitimate inference in
that party's favor, the only conclusion a reasonable jury could
have reached is one in favor of the moving party."); **Tools USA**
**and Equipment Co. v. Champ Frame Straightening Eqpt. Inc.**, 87
F.3d 654, 656-57 (4th Cir. 1996) (citations omitted) ("Champ
argues that the district judge erred in denying its motions for
judgment as a matter of law with respect to both liability and
damages.  A court may only grant a motion for judgment as a
matter of law (formerly j.n.o.v.) if, viewing the evidence in the
light most favorable to the non-moving party and drawing every
legitimate inference in that party's favor, the court
"determine[s] that the only conclusion a reasonable trier of fact
could draw from the evidence is in favor of the moving party.");
**Hetzel v. County of Prince William**, 89 F.3d 169, 171 (4th Cir.
1996).

B.   Analysis


1.   Limitations Defense


        The court first addresses Fountain Place's late-rising

limitations defense.   See EQT Gathering Equity, LLC v. Fountain

Place, LLC, No. 2:09-0069, 2011 WL 5419452, at *1 (S.D. W. Va.

Nov. 9, 2011) (noting that during the September 9, 2011, pretrial

conference the court discussed with counsel "the recent

invocation of statute of limitations and laches defenses by

defendant Fountain Place, LLC . . . .").   At the time of the

pretrial conference, and until the trial of this action, it was

essentially assumed that, at the least, plaintiffs' two tort

claims for trespass and negligence were subject to the two-year

limitations period found in West Virginia Code section 55-2-

12(a).   Id. at *2 ("The . . . limitation provision for tortious

damage to property is West Virginia Code § 55-2-12(a).").

        Despite the two-year limitations provision, plaintiffs

believed at the time of the pretrial conference that they might

properly avail themselves of the continuing tort exception.   Id.

("Plaintiffs assert that the limitations period has not expired.

They contend that the torts in question, which are claims for

14

negligence and trespass, are of a continuing nature and the limitations period has not accrued.").

In the November 9, 2011, memorandum opinion and order, the court concluded that (1) the accrual date for plaintiffs' claims was fact bound, and (2) plaintiffs could not rely upon the continuing tort exception to the limitations period otherwise applicable to their claims for negligence and trespass.[4]

This ruling is now coupled with a jury finding respecting accrual. Special interrogatory 2A reflects that, by November 21, 2001, plaintiffs knew or in the exercise of reasonable diligence should have known, of the fill placement by Fountain Place. Inasmuch as plaintiffs instituted this action on January 26, 2009, their trespass and negligence claims are time barred.

It is, accordingly, ORDERED that the Fountain Place's motions for judgment as a matter of law be, and they hereby are, granted to the extent that they request dismissal of the Count

---

[4]The court declined to address Fountain Place's laches defense at that time. The Supreme Court of Appeals of West Virginia has observed that "laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right." Grose v. Grose, 222 W. Va. 722, 728, 671 S.E.2d 727, 733 (2008)(internal quotation marks and citations omitted). The proponent of the defense must demonstrate a "lack of diligence by the party causing the delay and prejudice to the party asserting it." Id. Fountain Place has demonstrated neither requirement.

Four negligence and Count Five trespass claims based upon expiration of the two-year limitations period governing those tort causes of action.

That adjudication leaves for consideration only the Count Three status-quo claim.  Fountain Place asserts that the claim is subject to the same two-year limitations period governing the negligence and trespass causes of action.[5] Plaintiffs, for the first time at trial, and in their posttrial briefing, rely upon the 10-year limitation period found in West Virginia Code section 55-2-6.  Section 55-2-6 states materially as follows:

> Every action to recover money, which is founded upon . . . any contract . . . shall be brought within the following number of years next after the right to bring the same shall have accrued, that is to say: . . . . if it be upon any other contract in writing under seal, within ten years; if it be upon an award, or upon a contract in writing, signed by the party to be charged thereby, or by his agent, but not under seal, within ten years . . . .

W. Va. Code § 55-2-6.

Fountain Place contends specifically as follows respecting the limitations defense:

> The so called "status quo" claim being derived from the alleged negligent act and/or trespass act of fill dirt being placed on the pipeline is likewise subject to the usual date of injury accrual rule for calculating

---

[5]It is noted that the jury returned a verdict in Fountain Place's favor respecting the negligence claim.

16

> whether Plaintiffs claims were filed within the
> applicable two year period.

(Memo. in Supp. at 2).  No authority is cited for that

proposition.   The decision in <u>Quintain</u> is the starting point for

divining the applicable limitations period.

        At issue in <u>Quintain</u> was the relocation of a 16-inch

natural gas pipeline owned by Columbia Natural Resources, Inc.

("CNR").  The pipeline crossed certain parcels through easements

obtained by CNR's predecessor in interest.  The relevant language

creating the easements provided, in part, as follows:

> "It is expressly understood and agreed that the rights
> and privileges hereby granted shall not interfere with
> the proper and reasonable use of said premises for the
> mining and removal of coal and other minerals therefrom
> or the cutting and removing of timber from said
> premises." . . .
>
>        "The said grantors, their heirs or assigns, to
> fully use and enjoy the said premises, except for the
> purposes hereinbefore granted to the said United Fuel
> Gas Company, a corporation, which hereby agrees to pay
> any damages which may arise in the future from the
> maintaining, operating and removing of said pipe line .
> . . ."

<u>Id.</u> at 131, 556 S.E.2d at 98 (quoted source omitted).

        Quintain later obtained certain leasing rights to mine

coal in the area.  It demanded that CNR move the pipeline at

CNR's cost inasmuch as the conveyance was interfering with

Quintain's planned mining operations.  CNR was willing to move

the pipe line but demanded that Quintain pay all associated

costs.  As in this case, there is no question that the status-quo

claim found in Quintain was based upon the breach of a written

instrument creating certain easements.  This excerpt from

Quintain illustrates the point:

> We have determined . . . that the language of the right
> of way deeds over the Vinson and Baach tracts do[]
> require CNR to relocate its pipeline to facilitate
> mining. . . . We have also determined in this opinion
> that, under the Vinson and Baach deeds, CNR was not
> required to bear the financial burden of relocating its
> pipeline from those tracts. Consequently, Quintain
> cannot show that CNR exceeded the scope of the Vinson
> or Baach easements merely by its refusal to pay for the
> relocation.

Id. at 137, 556 S.E.2d at 104 (emphasis added); see also id. at

132, 556 S.E.2d at 99 ("The circuit court concluded that certain

language contained in the two deeds granting easements over the

Vinson and Baach tracts clearly established that the parties to

the two deeds intended the coal estate to be the dominant estate.

Based upon this conclusion, the circuit court granted the

injunction directing CNR to relocate its pipeline at its own

expense.").

It is thus apparent that the obligations and duties

imposed in Quintain arose not from tort but rather contract.

This court has likewise understood the contractual-based nature

of the Quintain status quo claim since the earliest points of

18

this litigation.   <u>See</u>, <u>e.g.</u>, <u>EQT Gathering Equity, LLC v.</u>

<u>Fountain Place, LLC</u>, No. 2:09-0069, 2010 WL 816824, at *9 (S.D.

W. Va. Mar. 5, 2010) (discussing at length the CCC Lease language

in the course of adjudicating the Count Two <u>Quintain</u> claim

relating to BR-886/1875 earlier in this case).


        It is thus apparent that the <u>status quo</u> claim is

founded upon a breach of the CCC lease, which permits plaintiffs

to locate DC-4 on the subject property and maintain it in a safe

and workmanlike manner.   That type of breach, as opposed to one

based in tort, is a significant consideration in light of long-

settled West Virginia law.   For example, in <u>Headley v.</u>

<u>Hoopengarner</u>, 60 W. Va. 626, 55 S.E. 744 (1906), it is stated as

follows:

> This is the ordinary oil and gas lease, with a
> reversion to the grantors, for the purpose of mining
> and operating for oil and gas, laying pipe lines,
> building tanks, stations, and structures thereon, and,
> in consideration thereof, to pay as royalty a
> one-eighth part of all the oil produced and saved from
> the leased premises.   While we have some cases which
> may be construed to hold that the ordinary oil lease,
> investing the lessee with the right to remove all the
> oil in place in the premises in consideration of a
> certain stipulated royalty, is, in legal effect, a sale
> of a portion of the land, yet these cases do not
> conform to many others, which treat <u>such contracts</u> only
> as leases, and a conveyance for a term of years, and
> not to pass an estate in fee.   <u>We do not think the
> lease in question can be so construed as to be other
> than a contract which passes only an estate for years</u>.

> "<u>A lease is a contract</u> for the possession and profits
> of lands and tenements on the one side, and the
> recompense or rents on the other, or, in other words, a
> conveyance to a person for life, years, or at will, in
> consideration of a rent or other recompense." 18 Am. &
> Eng. Ency. Law (2d Ed.) 597.

<u>Id.</u> at 635, 55 S.E. at 748 (emphasis added); <u>Harvey Coal & Coke
Co. v. Dillon</u>, 59 W.Va. 605, 611, 53 S.E. 928, 931 (1905)('"<u>A
lease is a contract</u> for the possession and profits of lands and
tenements on the one side and the recompense or rents on the
other, or in other words, a conveyance to a person for life,
years or at will, in consideration of a rent, or other
recompense.") (emphasis added)(citation omitted); <u>see also United
States v. Gratiot</u>, 39 U.S. 526, 538 (1840) ("The legal
understanding of a lease for years is, <u>a contract for the
possession and profits of land for a determinate period</u>, with the
recompense of rent. The contract in question is strictly within
this definition.") (emphasis added).

     Indeed, the supreme court of appeals has specifically
concluded, in at least one gas lease case, that section 55-2-6
governs the matter of a breach.  <u>See Sansom v. Sansom</u>, 148 W. Va.
603, 606-07, 137 S.E.2d 1, 4 (1964) (in an action by two lessors
against a third lessor for amounts received under gas lease by
third lessor as lessors' agent, supreme court of appeals citing
section 55-2-6 and noting, "There was no contract in writing

between the plaintiffs and the defendant in order for the ten

year statute of limitations to be applicable.  The action must be

based on a contract in writing and the obligation or liability

must grow immediately out of the written instrument, and not

remotely.").

     Based upon the foregoing, the court concludes that the

Count Three status-quo claim is based upon a breach of the signed

and written CCC lease.  The cause of action is thus properly

construed as sounding in contract.  As such, the 10-year period

found in section 55-2-6 governs plaintiffs' status quo claim.

Inasmuch as this action was filed within 10 years of the November

21, 2001, accrual date found by the jury, the status-quo claim is

timely.

                    2.  Other Post Trial Contentions

     It is next asserted that plaintiffs proved only that

Fountain Place was "working over" DC-4 and, "at best, [placed] a

de minimis" amount of fill material upon it.  (Mot. for Jgt. at

1).  Sufficient evidence and the verdict are otherwise.  As

noted, David Jewell unequivocally stated that he personally

witnessed Fountain Place agents using a "dozer . . . pushing dirt

covering" the pipeline.  (Tr. at 47).  He also "tried to explain

                                   21

the hazards and the dangers of that," some indication respecting the volume of dirt being pushed and the nature of the work being performed.  Id.; see also id. at 61 (witness adopting counsel's characterization and reiterating that there was no "doubt in . . . [his]  mind that they were working, pushing dirt over that pipeline . . . .")).

This evidence, and the legitimate inferences to be drawn therefrom, plainly support the jury's response to special interrogatory 5, namely, that "Fountain Place placed dirt over the pipeline and thereby disturbed the status quo to the extent that it became reasonably necessary that EQT relocate its pipeline[.]"  (Spec. Interrogs. at 2 (emphasis added)).  Viewed in the light most favorable to plaintiffs, the jury could properly have reached its verdict as to the status-quo claim in Count Three.

Fountain Place next contends that plaintiffs failed to present expert testimony that the fill material "created a risk of serious harm to the pipeline's integrity . . . ." (Def.'s Mot. at 2).  First, it is noteworthy that Fountain Place did not object at trial to testimony and documentary evidence received from plaintiffs on the point.  For example, Joe Gilmore testified that the burial of noncoated pipe, such as the apparently bare

DC-4, results in speedier corrosion.  (Tr. at 6).  Further, on cross examination, Ricky Dalton conceded that it was unsafe to work around an active gas pipeline.

Second, however, Fountain Place itself sponsored the introduction of this same type of evidence.  Fountain Place's exhibit 2 is a November 24, 2001, email from David Jewell to Joe Gilmore.  It states as follows:

> I have been attempting to keep them from damaging our facilities and I have attempted to warn them of the safety factors involved in working on top of our P/L.
>
> A couple of weeks ago I requested a letter of their intentions and an acknowledgment of the safety issues. . . .
>
> Our well operator discovered them working on top of the line again on Wed.

(Def.'s Ex. 2 at 1 (emphasis added).  Similarly, Fountain Place secured the admission into evidence of exhibit 7, a September 24, 2007, letter from EGE Vice President and General Counsel David K. Dewey, to Fountain Place's principals, stating that "Fountain Place's encroachment over this natural gas pipeline is decidedly inadvisable from a safety standpoint."  (Def.'s Ex. 7 at 1).  Fountain Place's exhibit 8, which is additional correspondence between the aforementioned individuals dated February 6, 2008, states that plaintiffs have begun relocating the pipeline "[d]ue to the potential for safety issues created by Fountain Place's

23

placement of substantial overburden on the line . . . ."  (Def.'s
Ex. 8 at 1).

This and other evidence in the record amply supports
plaintiffs' view that the relocation of DC-4 was necessary.  The
court would not, in any event, have permitted expert evidence
under the circumstances.  In Scott v. Sears, Roebuck & Co., 789
F.2d 1052 (4th Cir. 1986), our court of appeals observed as
follows:

> Rule 702 makes inadmissible expert testimony as to a
> matter which obviously is within the common knowledge
> of jurors because such testimony, almost by definition,
> can be of no assistance. . . . [S]o long as the jury,
> by virtue of common experience, is capable of resolving
> a factual issue, it will not be prevented from doing so
> because of the absence of expert testimony.

Id. at 1055 (citing Salem v. United States Lines Co., 370 U.S.
31, 35 (1962)); 29 Charles A. Wright et al., Federal Practice &
Proc. § 6264 (1st ed. )("[E]xpert testimony does not assist where
the jury has no need for an opinion because it easily can be
derived from common sense, common experience, the jury's own
perceptions, or simple logic.").

The jury did not require the assistance of an expert
witness in order to understand that burying an active gas
pipeline under 30 feet of fill material, and then running
bulldozers over top of it, constituted a danger to the integrity

24

of the pipeline and those in its vicinity.  It was capable of using its common sense, experience, and logic to appreciate, and understand the significance of, such evidence.

The court concludes that, with the evidence and legitimate inferences drawn therefrom viewed in the light most favorable to plaintiffs, the jury could properly have found that pipeline safety and integrity issues required the 2008 relocation of DC-4.[6]

---

[6]This same observation aids the disposition of Fountain Place's final contention, namely, that plaintiffs failed to demonstrate that they relocated the pipeline due to either an express or implicit request from Fountain Place.  To the extent such a request is necessary to impose liability on a status-quo claim, the finding that Fountain Place deposited fill material over DC-4, hence altering the status quo in a manner requiring pipeline relocation, constitutes an implicit request for relocation sufficient to support imposition of liability as to Count Three.  Fountain Place's assertion thus lacks merit.

III.


Based upon the foregoing discussion, it is ORDERED as follows:

1.   That defendant's motions for judgment as a matter of law be, and they hereby are, denied except insofar as the Count Four negligence and Count Five trespass claims be, and they hereby are, dismissed as time barred; and

2.   That this action be, and it hereby is, stricken from the docket.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED:  March 15, 2012

John T. Copenhaver, Jr.
United States District Judge